Louis **FIREISON** and Bernadine **Fireison, Appellants,**

v.

Luvie M. **PEARSON, Appellee.**

No. 84–157.

District of Columbia Court of Appeals.
Argued July 10, 1985.
Decided Jan. 29, 1986.

Michael Alan Olshonsky, Washington, D.C., with whom Mary P. Nyiri, Washington, D.C., was on the brief, for appellant.

Kenneth J. Ingram, Washington, D.C., for appellee.

Before MACK, BELSON and ROGERS, Associate Judges.

MACK, Associate Judge:

In this action by appellants Louis and Bernadine Fireison against appellee Luvie M. Pearson for fraud and breach of contract, the trial court, sitting without a jury, granted a defense motion to dismiss the case at the close of plaintiffs' evidence. We reverse.

I.

In March of 1975, Louis Fireison became aware that the Merry-Go-Round farm in Montgomery County, Maryland, owned by Mrs. Drew (Luvie) Pearson, was for sale. He set up an appointment with Tyler Abell, Pearson's agent and the developer of the tract, to inspect the property. Abell provided him with a plat of the farm, which showed a division of the property into 17 lots. The plat, which is dated June, 1975, listed the area of Lot no. 6 as 5.1 acres. Abell showed Fireison the approximate boundary lines of all of the lots on the farm. The beginning and end of each lot were marked with steel stakes. Fireison understood that these stakes had been laid out by a surveyor. Fireison became interested in lot 6, partly because of a row of tall, old trees that lined one side of the property. The trees added value to the lot and in addition provided privacy and a natural barrier between lots 6 and 5. The boundary line of lot 5, according to Abell, began on the other side of the trees. Abell confirmed that the approximate area of lot 6 was 5.1 acres, and according to Fireison, led him to believe that the June, 1975, plat that he had showed him had already been recorded in the Montgomery County land records.

Pearson, the owner of the property, offered Fireison a five-year option to buy lot 6, and Fireison, an attorney, drafted an option contract that the parties signed in October of 1975. Paragraph 13 of the contract provided that "Vendor agrees to deliver the subject property in its recorded size consisting of approximately 5.1 acres." Other sections of the contract provided that copies of any surveys or plats of the property that might be ordered by the owner would be delivered to Fireison in advance of settlement (para. 5); and that an exact topographical survey would be made by the owner and a copy furnished Fireison (para. 7). The June, 1975 plat that Fireison understood had been recorded was attached to the option contract. This plat in fact had never been recorded.

Prior to exercising the option, Fireison visited the property on numerous occasions, and never observed any change in the stakes that marked out the boundaries of lot 6. In April of 1976, unbeknownst to Fireison, however, Abell changed the boundaries of lot 6. Lot 5 had remained unsold, so Abell sliced off the part of lot 6 that included the trees and appended it to lot 5 to make it more marketable. In addition, he cut off part of the back of lot 6 so that he would be able to create two lots behind lot 6 instead of an existing one. Lot 6 in its pared down form was 4.5964 acres. Abell must have had a survey prepared of the new boundaries of the lot,[1] for on November 6, 1978, he recorded a new plat in the Montgomery County land records, showing the area of lot 6 as 4.5964 acres. No copy of the plat or of the survey was furnished to Fireison, however, as the option contract required; indeed, no notice at all was given to Fireison that the June, 1975 plat, which he thought was recorded, had been superseded, and that the acreage and boundaries of the property subject to the option had been changed significantly.

On December 15, 1978, five weeks after Abell had the new plat recorded, the parties proceeded to settlement on the property. At settlement the owner gave Fireison no indication of the change in the acreage and boundary lines of his property; neither a new survey nor the new plat was provided him. Fireison had assumed the burden of searching the title of the property, and he entrusted this duty to an attorney, who also prepared a deed. According to Fireison, the lawyer searched the title only for outstanding liens, and found none. There is no record evidence that she saw the new plat that Abell had recorded, although she did reference a plat book and number in the deed of sale. The deed included no physical description of the lot.

After taking possession of the property, Fireison received a county property tax bill, in 1979, that he thought seemed too low. He contacted the tax assessor's office and was informed that the acreage of his lot was only 4.5964 acres. He called Abell, who related how he had reshaped the lot to make other lots attractive, as described above, and then told Fireison "just ... to forget about it. He said I wasn't using the land anyway and it was nothing extra out of my pocket, just told me to forget about it." This action followed.

## II.

The trial court issued findings of fact and conclusions of law following the close of plaintiff's case, dismissing the action under Super.Ct.Civ.R. 41(b). Under that rule, the court may not dismiss an action unless "upon the facts and the law the plaintiff has shown no right to relief." *Carrigan v. Purkhiser*, 466 A.2d 1243, 1245 (D.C.1983). Judgment for a defendant under Rule 41(b) is justifiable if "there is insufficient credible evidence to sustain each element of plaintiff's claim, or if, despite such credible evidence, a valid defense is evident from plaintiff's own case."

---

**1.** *See* 2 Montgomery County Code § 50–10 (1984) (surveyor's certificate must accompany record-ed plat).

*Marshall v. District of Columbia,* 391 A.2d 1374, 1379 (D.C.1978). Nevertheless, a dismissal under Rule 41(b) is a "drastic remedy, to be sparingly exercised." *Bay General Industries, Inc. v. Johnson,* 418 A.2d 1050, 1054–55 (D.C.1980). "[S]ound procedure in most cases requires withholding adjudication on the merits until both sides have presented their evidence." *Warner Corp. v. Magazine Realty Co.,* 255 A.2d 479, 481 (D.C.1969); *Darden v. Capitol Cab Cooperative Association,* 154 A.2d 352, 354 (D.C.1959). This is so because a "judgment rendered on all the evidence is likely to be more sound than one rendered on less than all." *National Tire Dealers & Retreaders Association v. G.D.C. Corp.,* 147 A.2d 869, 871 (D.C.1959).

The trial court based its dismissal on two alternative grounds. It concluded, first, that Fireison had not set forth a prima facie case of fraud. The court found that "[w]hile the defendant should have pointed out that the defendant re-drew the lot lines for their own advantage, they engaged in no direct deceit." *Memorandum Opinion and Order* at 2. The court also found that even if plaintiffs had established all of the elements of fraud, their own case demonstrated that the defendant had a valid estoppel defense to the action. The court noted that since the new plat showing lot 6 to be 4.5964 acres had been recorded prior to settlement, Fireison's settlement attorney, who was responsible for a title search, was "charged with notice of all that appears in the properly recorded chain of title." This notice is imputable to Fireison. By accepting the burden of the title search, the court held, Fireison had also accepted the "risk of failing to do so," *i.e.,* the risk of failing to uncover that he had been defrauded by the owner.

The court also decided that since the option contract stated that the Vendor agreed to provide the property in its "recorded size consisting of approximately 5.1 acres," that Fireison had "freely contracted" to accept the property in whatever size it had been recorded. The court did not accord any significance either to the fact that Fireison understood from Abell that the property had been recorded in 1975 at approximately 5.1 acres, with the boundaries fixed as Abell had represented to him at the time the option contract was executed; or to the owner's failure to notify Fireison of the change in the acreage and boundary lines by sending him, as the option contract had required, copies of any new surveys and plats. The court found instead that "the plaintiffs proceeded to settlement in spite of the defendant's non-performance, thus waiving the right to receive the survey from the defendant prior to settlement." The trial court did not specifically address the arguments that (1) Fireison could not have been expected to insist upon his contractual right, under paragraph 5 of the option agreement, to receive copies of the new survey and plat, because he had no notice of the existence of these documents; or that (2) the failure to provide the plat and survey as contractually required is some evidence of fraud. The court impliedly found that the plat book and number listed in the deed were sufficient notice to Fireison that the boundaries and acreage of this property had been changed; that his proceeding to settlement on this deed worked an implied acceptance of the new, restricted, boundaries of the property; and that his prior dealings with Abell merged into the deed, preventing him from now raising any challenges to the sale.

### III.

■ It is a "familiar rule of construction" that where a plat is referred to in a deed, "the effect is the same as if it were copied into the deed." *Noonan v. Lee,* 2 Black 499, 504, 67 U.S. 499, 504, 17 L.Ed. 278 (1863). In other words, where the deed references a plat, the "particulars appearing upon the plat are to be as much regarded, in ascertaining the true description of the land and the intent of the parties, as if they had been expressly enumerated in the deed." *Jefferis v. East Omaha Land Co.,* 134 U.S. 178, 195, 10 S.Ct. 518, 522, 33

L.Ed. 872 (1890); *see Whittington v. Mann*, 211 Md. 199, 203, 126 A.2d 617, 619 (1956) (same). Nevertheless, where there is fraud or mistake in the plat reference "by way of description of the premises conveyed," the buyer is not absolutely bound by that reference, but has a remedy "in chancery to reform the deed." *Jones v. Johnston*, 59 U.S. (18 How.) 150, 153, 15 L.Ed. 320 (1856); *see also Gross v. Stone*, 173 Md. 653, 664, 197 A. 137, 142 (1938) (deed whose execution was induced by fraud may be impeached). If Fireison is able to demonstrate fraud by clear and convincing evidence, he is entitled to reformation of the deed, specific performance to the extent that the property he bargained for (but did not receive) has not been sold, and an abatement of the purchase price for the remainder, notwithstanding the fact that the deed references the plat with the smaller acreage. *See Boring v. Jungers*, 222 Md. 458, 467, 160 A.2d 780, 786 (1960) (affirming specific performance of contract for sale of property based on what buyers had "bargained for and [thought] they were getting," where owner had misrepresented scope of frontage; specific performance is affirmed even though buyers' agent had possession of plat showing true boundary line, and agent's knowledge is imputed to buyer); *Reigart v. Fisher*, 149 Md. 336, 346, 131 A. 568, 572 (1925) (affirming specific performance and abatement of purchase price as remedies where owner's agent had materially misrepresented acreage).

The Maryland courts have repeatedly affirmed the principle that in contracts of this type,

> [W]here statements of fact which are essentially connected with the subject of the transaction ... "and especially where they are concerning matters which, from their nature or situation, may be assumed to be within the knowledge or under the power of the party making the representation, the party to whom it is made has a right to rely on them, he is justified in relying on them, and in the absence of any knowledge of his own, or

of any facts which should arouse suspicion and cast doubt upon the truth of the statements, he is not bound to make inquiries and examination for himself." *Glendale Corp. v. Crawford*, 207 Md. 148, 158, 114 A.2d 33, 36 (1955) (citation omitted); *see Ryan v. Brady*, 34 Md.App. 41, 55, 366 A.2d 745, 753 (1976). This is true even though "the truth could have been ascertained by an examination of the public records." *Glendale Corp., supra*. In *Piper v. Jenkins*, 207 Md. 308, 314, 113 A.2d 919, 922 (1955), the court noted that where "the vendor undertakes to point out the boundaries to the purchaser, he is under an obligation to point them out correctly; and the purchaser has a right to rely upon such a representation ... and he can hold the vendor liable for any fraudulent misrepresentation." The buyer is not required under these circumstances "to make an examination of the land records" to determine the correct acreage, "or to employ a surveyor to make a plat of the land." *Id*. The vendor "cannot avoid the[] consequences [of his false statements] merely because the vendee might have ascertained their falsity by a survey of the land or by reference to official plats and records." *Lanning v. Sprague*, 71 Idaho 138, 143, 227 P.2d 347, 350 (1951), cited with approval in *Piper, supra*. The buyer's omission to take any of these steps cannot be held against him because such an omission is "a natural consequence of the fraudulent representations. They had precisely the effect designed by the [seller], and he [is] properly held responsible for the resulting damage." *Gustafson v. Rustemeyer*, 70 Conn. 105, 139, 39 A. 104, 108 (1898), cited with approval in *Piper, supra*. In sum, where there are purposeful misrepresentations by the seller, the fraud estops the seller from arguing that the deed, referencing the plat, represents the final intention of the parties.

■ The seller argues that because Fireison took upon himself the burden of performing a title search and preparing the deed, he was placed on constructive notice of the new plat that was contained in the

land records. It cites *Ryan v. Brady, supra,* for the proposition that where an agent of the buyer undertakes to make an examination of the land records, he cannot be heard to argue that he was injured by the seller's misrepresentations. 34 Md. App. at 55, 366 A.2d at 753. In *Ryan,* however, in contrast to this case, the record showed that the buyer's attorney had actually reviewed the recorded plat. *Id.* at 53, 366 A.2d at 752. The attorney's *actual* notice could therefore be imputed to the buyer to defeat his claim. In the instant case, however, there is no evidence that Fireison's attorney opened the plat volume, nor is there any evidence that in performing a title investigation—searching the deed records and assessment books for outstanding liens—she would necessarily have had occasion to do so. There is therefore no evidence of actual notice that can be imputed to appellant of the more limited boundaries of the subject property. Moreover, even if it could be argued that an attorney or agent who assumes the burden of a title search is placed on constructive notice of every item of information pertaining to the property that may be found in the lands records, we do not think that such constructive notice may be imputed to the agent's principal. *Ryan,* in view of the decisions it relies upon and its facts (the attorney there admitted that he had looked at the plat), does not so hold.

■ More importantly, the claim in *Ryan* was not fraud, but negligent misrepresentation; there was "no evidence of fraudulent misconduct on the part of any of the individuals involved in the case." *Id.* at 49, 366 A.2d at 750. Where there is some evidence of fraud, or even bad faith, similar principles do not apply. In *Chesapeake Homes, Inc. v. McGrath,* 249 Md. 480, 489, 240 A.2d 245, 250 (1968), as in this case, the owner's sales manager had misrepresented the scope of the property, and relying on that representation, the buyer had purchased the property. Although the reported opinion does not state which of the parties had the deed prepared and title

search completed, as in this case a plat book and number incorporated by reference was the sole description of the property contained in the deed. Also as in this case, the buyer was an attorney, and therefore "should be held to the exercise of a greater degree of diligence than that demanded of the ordinary layman in a real estate transaction." *Id.* at 486, 240 A.2d at 248. The owner argued that the buyer had frequently observed and had many opportunities to inspect a plat showing the true boundaries of the property hanging on the sales manager's wall, and therefore should be estopped from seeking rescission of the contract on the basis of mispresentations. The court found that the sales manager had engaged in a pattern of activity with the evident aim of preventing the disclosure of the true extent of the property to the buyer. It therefore held:

> Consequently, the appellants are not in a position to raise an estoppel against the [buyers]. One claiming the benefit of an estoppel must not only be free from fraud in the transaction but he must also act with good faith and reasonable diligence; otherwise no equity arises in their favor. [Citations omitted.]

*Id.* at 489, 240 A.2d at 250. Similarly here, if the plaintiff has adequately presented a prima facie claim of fraud, the seller may not avoid the claim by arguing that a thorough title search undertaken by the buyer's attorney would have revealed both that the 1975 plat had not been recorded, and that the actual acreage on the lot was smaller than that represented to Fireison by Abell. It is to the question of whether plaintiff's case made out an adequate claim of fraud that we now turn.

### IV.

■ Fraud under Maryland law is proved "when it is shown that a false representation has been made (1) knowingly or (2) without belief in its truth or (3) recklessly, careless whether it be true or false." *Piper v. Jenkins,* 207 Md. 308, 312, 113 A.2d 919, 921 (1955). Under this standard, the evidence presented by plaintiffs is suf-

ficient to withstand a Rule 41(b) motion to dismiss. According to plaintiffs' evidence, Abell, the owner's agent, engaged in a pattern of conduct designed to deceive and defraud plaintiffs. Abell led Fireison to believe that lot 6 had been recorded in the land records at 5.1 acres. He induced Fireison to rely to his detriment upon his representations as to the boundaries of lot 6, both as to the tall trees and as to the back part of the lot. Knowing that Fireison had obtained an option on the property as described by Abell, Abell nevertheless changed the configuration of the property and subtracted some acreage without informing Fireison. Abell failed to comply with the option contract's requirement that he provide copies to Fireison of all new plats and surveys, information that would have put Fireison on notice of the changes. Although Fireison entered the farm several times prior to settlement and saw Abell, Abell never mentioned the changes he had made in the property. Nor, apparently, did he change the configuration of the surveyor's stakes on lot 6 that marked out the boundaries of a 5.1 acre lot. Despite the fact that Abell changed the boundaries of the lot in April of 1976, he did not record the changes until five weeks prior to settlement on the property, in late 1978. Taken together, these facts compellingly demonstrate a pattern of deception by Abell. The trial court's finding that no case of fraud was made out by plaintiffs because the owner "engaged in no direct deceit" is therefore clearly erroneous. *Bay General Indus., supra,* 418 A.2d at 1054. If not refuted, Fireison's proof entitled him to relief. Accordingly, the court erred in granting the defense motion to dismiss, and we therefore reverse the trial court's order.

*So ordered.*

**BELSON, Associate Judge, dissenting:**

The majority opinion fails to apply the doctrine, endorsed by the Maryland courts, that when the purchaser or his agent *undertakes* to review land records, he may not contend that he was misled to his injury by the vendor's misrepresentations. Here, not only did appellant's agent, his attorney, undertake a title search, but his attorney also prepared the deed with its description of the conveyed property.

Elaboration of several factual points will help to explain why the trial court should be affirmed. As the majority notes, Fireison drafted the option contract. In addition to those clauses discussed by the majority, the option contract provided that the property would "be conveyed as designated by Vendees and Vendees hereby authorize the examination of title and preparation of all necessary conveyance papers." Accordingly, Fireison's attorney prepared the settlement documents, including the deed.

The majority states that that deed included no physical description of the lot. Significantly, however, the deed effected the conveyance of: "the following described land and premises ... namely: Lot numbered Six (6) in the subdivision known as 'MERRY–GO–ROUND FARM', as per plat recorded in Plat Book 106 at Plat No. 12150 among the Land Records of Montgomery County, Maryland." The designated plat, recorded by Pearson on November 6, 1978, on its face clearly states the area of lot 6 as 4.5964 acres.

In light of the facts of record, it can be seen that the majority analysis has two significant shortcomings. First, it fails to recognize the permissible—if not inexorable—factual inference that Fireison's attorney viewed the November 1983 plat to which she referred in the deed.[1] Certainly the trial judge in making findings pursuant

1. In *Ryan v. Brady,* 34 Md.App. 41, 53, 366 A.2d 745, 752 (1976), purchaser's attorney, who searched title, acknowledged that it was obvious that he saw the recorded plat before drafting deed and other papers. The trial judge in that case had stated: "[T]he Court cannot conceive of a conscientious title attorney ... engaged in a transaction of this size and character [sale of house and lot for $240,000], failing to read the recorded plat of subject property preparatory to drawing the contract of sale and deed and guaranteeing the title...." *Id.* at 57, 366 A.2d at 754.

to Super.Ct.Civ.R. 41(b), was free to draw that inference.

Second, the majority interprets Maryland law as follows: "where there are purposeful misrepresentations to the buyer, the fraud estops the seller from arguing that the deed, referencing the plat, represents the final intention of the parties." Majority op. at 1275. I disagree with that formulation for the reasons I develop below.

Before discussing those two points, I wish to make clear that I am in agreement with the majority that under Maryland law the purchaser of property is required neither to examine the land records, nor survey the land, in order to determine the correct acreage. *See Piper v. Jenkins*, 207 Md. 308, 314, 113 A.2d 919, 922 (1955). The purchaser clearly has a right to rely on the vendor's representations as to the boundaries and acreage of the land. *Id.* Even when the means of ascertaining the falsity of the vendor's representations are known and accessible, the purchaser's failure to review the land records will not bar his recovery. *See Chesapeake Homes, Inc. v. McGrath*, 249 Md. 480, 240 A.2d 245, 248–49 (1968).

If, however, "the means of knowledge are at hand, *and the purchaser undertakes to make an examination of the land records*, he cannot say that he was deceived and injured by misrepresentations of the vendor." *Piper v. Jenkins*, 207 Md. at 314, 113 A.2d at 922 (emphasis added); *accord Ryan v. Brady*, 34 Md.App. 41, 55, 366 A.2d 745, 753 (1976); *see also Boring v. Jungers*, 222 Md. 458, 462–65, 160 A.2d 780, 783–84 (1960) (sale may not be rescinded even if founded on misrepresentations of vendor when purchaser knew facts; knowledge of agent imputable to purchaser); *Glendale Corp. v. Crawford*, 207 Md. 148, 154, 114 A.2d 33, 36 (1955) (purchaser has right to rely on vendor's representation "in the absence of any knowledge of his own"); *Gunby v. Sluter*, 44 Md. 237, 249 (1876) (purchaser may not rescind sale, even though founded on misrepresentations, if prior to sale purchaser acquainted

with facts). The crucial question thus is whether Fireison—by himself or through his agent—undertook an examination of the land records.

Contrary to the majority's assertion, the controlling question just identified is not restricted to cases of negligent or innocent misrepresentation. Rather, the Court of Appeals for Maryland enunciated the "undertaking" principle in *Piper v. Jenkins*, a case in which the purchaser alleged that the vendor had made a fraudulent misrepresentation. 207 Md. at 312, 113 A.2d at 921. Moreover, the majority attaches a significance to the lack of fraud in *Ryan v. Brady* that the Court of Special Appeals of Maryland itself did not attach. The court reiterated in *Ryan* the principle of *Piper v. Jenkins* that "once the purchaser assumes the burden of an examination he cannot say that he was deceived to his injury where such examination discloses the correct information." *Ryan v. Brady*, 34 Md. App. at 55, 366 A.2d at 753. Most important, both *Piper v. Jenkins* and *Ryan v. Brady* adopted that principle from the Supreme Court opinion in *Shappirio v. Goldberg*, 192 U.S. 232, 24 S.Ct. 259, 48 L.Ed. 419 (1904). *Shappirio involved a claim of fraud, and is, I believe, dispositive of the instant case.*

In *Shappirio*, the purchaser alleged that the vendor falsely represented that the property adjacent to the purchased lot was included in the sale. 192 U.S. at 234, 24 S.Ct. at 260. A correct description of the property was, however, given in the deed and in the recorded chain of title. *Id.* at 241, 24 S.Ct. at 261. As in this case, the agent of the purchaser was entrusted with the examination of the deed and title. The Court explained that the agent was charged with the knowledge of the extent of the property conveyed since he undertook an examination of the deed and records. *Id.* The Court observed that a casual reading of the deed or recorded plat would have revealed the dimensions of the property. *Id.* The agent's knowledge, ac-

tual or implied, was imputed to the purchaser. *Id.* The Court stated:

> There are cases where misrepresentations are made which deceive the purchaser, in which it is no defence to say that had the plaintiff declined to believe the representations and investigated for himself he would not have been deceived. But such cases are to be distinguished from the one under consideration. When the means of knowledge are open and at hand or furnished to the purchaser or his agent and no effort is made to prevent the party from using them, and *especially where the purchaser undertakes examination for himself,* he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor.

*Id.* 241–42, 24 S.Ct. at 261 (emphasis added) (citation omitted). Here, too, a reading of the recorded plat would have revealed at once that plot 6 measured 4.6 acres. The vendors here did not prevent that reading, nor did they suggest the wording of the deed; rather Fireison's attorney undertook to describe the conveyance of property by referring to the recorded plat. Once the attorney undertook such an examination, she and her principal were charged with the knowledge imparted by the land records.

*Chesapeake Homes, Inc. v. McGrath,* 249 Md. 480, 240 A.2d 245 (1968), is not to the contrary. There is no indication in that opinion that the purchaser there undertook a title search or preparation of the deed. Certainly, the decision does not suggest a rejection of the *Shappirio* doctrine. The vendors in *Chesapeake Homes* did not assert that the purchaser undertook a title examination or deed preparation as in *Shappirio,* but contended that the purchaser could not seek relief from the deed when he *failed* to look at the referenced plat that he knew was posted at the vendor's office and filed at the land records office. 249 Md. at 489, 240 A.2d at 250. In holding in *Chesapeake Homes* that the vendor could not assert the failure of the purchaser to inform himself of land records when an

effort was made to prevent the party from using them, the Maryland Court of Appeals ruled in a manner consistent with Maryland law and with *Shappirio,* 192 U.S. at 241, 24 S.Ct. at 261. Therefore, the holding of *Chesapeake Homes* does not assist appellant here.

In the present case, however, not only did Fireison's attorney undertake to examine the land records for a title search, she undertook to describe the parcel to be conveyed by the deed. Because, as she drafted it, the deed conveyed the lot as "per plat recorded in Plat Book 106 at Plat No. 12150 among the Land Records of Montgomery County, Maryland," it stretches credulity to suggest that she did not look at that plat. *See Ryan,* 34 Md. at 53, 56, 366 A.2d at 752, 754. At the least, it was not clearly erroneous for the trial court to infer that she did. *See Marshall v. District of Columbia,* 391 A.2d 1374, 1379–80 (D.C.1978) (appellate court, pursuant to Super.Ct. Civ.R. 41(b) & 52(a), will not set aside trial court findings, unless they are clearly erroneous, with due regard to trial court's opportunity to judge credibility).

Furthermore, even if Fireison's lawyer did not actually look at the record plat, she was chargeable with notice once she undertook a title examination and preparation of the deed. *See Shappirio v. Goldberg,* 192 U.S. at 241–42, 24 S.Ct. at 261. Again, the majority suggests a distinction in *Ryan v. Brady* that the Maryland court itself did not hold dispositive. The purchaser's lawyer there at first could not recall whether he actually viewed the plat. He thereafter admitted, however, that he saw it. 34 Md. App. at 53, 366 A.2d at 752. The court stated that either the actual *or* implied notice of the lawyer would be imputed to his client: "a title examiner is charged with notice of whatever appears in the land records in the chain of title to the property involved.... [N]otice to an attorney is notice to his client." *Id.* (citations omitted); *see Williams v. Skyline Development Corp.,* 265 Md. 130, 164, 288 A.2d 333, 353 (1972).

Therefore, even if, *arguendo*, we assume a fraudulent misrepresentation on the part of the vendor, the undertaking by Fireison through his attorney to examine the title and describe the property in the deed defeats his claim that he was deceived to his injury. The trial court's judgment, therefore, should be affirmed.

Finally, I observe generally that as the record stood at the close of plaintiff's case, there was substantial evidence of misleading conduct on the part of defendant's agent. That evidence might or might not have been overcome by defendant's evidence. But the trial judge was not obliged to hear the defendant's case because plaintiffs' case in chief had demonstrated that defendant was entitled to judgment. Superior Court Civil Rule 41(b) authorizes a trial judge, sitting without jury, to weigh the evidence and consider credibility when a defendant moves to dismiss at the close of the plaintiff's case.[2] In view of the majority's somewhat disapproving discussion of such Rule 41(b) practice, I think it worth noting that the practice serves a valuable purpose, and in appropriate cases saves the trial court from having to hear, unnecessarily, a defense case where it is already apparent that plaintiff will not prevail. This practice is especially valuable where, if the motion is not granted, the defendant will present an affirmative defense or will call a large number of witnesses. While, as the majority points out, such motions should not be granted where to do so would be inconsistent with sound procedure or the interests of justice, majority op. at 1273, trial judges should not hesitate to grant them in appropriate cases.

I respectfully dissent.

**2.** In *Marshall v. District of Columbia*, 391 A.2d 1374, 1379 (D.C.1978), we said:
> [W]hen a defendant makes a Rule 41(b) motion in a nonjury trial, the court, as trier of fact, need not view the evidence in the light most favorable to the plaintiff. The court, rather "weighs the evidence and considers credibility the same as it would at the end of the trial." *Warner Corporation v. Magazine Realty Co.,* D.C.App. 255 A.2d 479, 481 (1969). *See Ellis v. Carter,* 328 F.2d 573 (9th Cir.1964).

The court, therefore, need not consider plaintiff's evidence as true, and if it finds that the evidence does not preponderate in plaintiff's favor, the court can enter judgment for the defendant. Thus, if there is insufficient credible evidence to sustain each element of plaintiff's claim, or if, despite such credible evidence, a valid defense is evident from plaintiff's own case, judgment for the defendant is justifiable.